UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LETITA McKELLAR,

                Plaintiff,                        No. 14-cv-13730

vs.                                       Hon. Gerald E. Rosen

STATE FARM FIRE AND
CASUALTY COMPANY,

                Defendant.
_____/

ORDER REGARDING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on January 26, 2015

PRESENT:   Honorable Gerald E. Rosen
                     United States District Chief Judge

## I. INTRODUCTION

This breach of insurance contract action is presently before the Court on the

Motion for Summary Judgment filed by the insurer, Defendant State Farm Fire and

Casualty Company.  Plaintiff Letita McKellar has responded to the motion and Defendant

has replied.  Having reviewed and considered the parties' briefs and supporting evidence,

the Court has determined that the relevant allegations, facts and legal arguments are

adequately presented in these submissions, and that oral argument would not significantly

aid the decisional process.  Therefore, the Court will decide this matter "on the briefs."

1

2:14-cv-13730-GER-MJH   Doc # 30   Filed 01/26/16   Pg 2 of 26   Pg ID 553

*See* Eastern District of Michigan Local Rule 7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

On September 2, 1983, Plaintiff Letita McKellar returned home from a five-day trip to Arkansas to find that water had damaged her residence at 18254 Muirland Street in Detroit, Michigan.  Ms. McKellar testified that, upon entering her house, she found water dripping from the ceiling of the foyer, a collapsed ceiling in the living room, and water pouring from the collapsed ceiling.  At that time, Plaintiff's residence and personal property were insured under a homeowner's insurance policy issued by Defendant State Farm Fire and Casualty Company ("State Farm").  Plaintiff promptly contacted the insurer on September 2, 2013 to report the damage to her property.

State Farm thereafter conducted an investigation into the origin and cause of the water damage.  The insurer retained a professional engineer, Mark Brennan of EFI Global, to inspect the premises and determine the cause of the damage.  Mr. Brennan concluded that the water leak had originated from the supply line to the toilet in the second floor master bedroom.  Brennan suggested that State Farm retain a metallurgy expert to examine the supply line (which Brennan had removed) to determine the reason the line failed.

Accordingly, State Farm retained Elizabeth C. Buc, Ph.D., a metallurgist from Fire and Materials Research Laboratory, LLC, to inspect the supply line and determine the

reason(s) it failed.

Based on her testing and analysis, Dr. Buc determined that the toilet fill valve end crimp location had been softened with heat and/or chemicals and pulled from the hose barb to cause the line separation. *See* Buc Affidavit, Ex. D. She was able to eliminate the manufacturing of the line or its fittings, and also was able to eliminate defective installation as causing or contributing to the failure. *Id.* She also ruled out any environmental causes (e.g., freezing) as a potential reason for the failure. *Id.*

While the experts were conducting their examination of the supply line, State Farm continued its investigation into the extent of Ms. McKellar's insurance claims. Specifically, State Farm investigated evidence it had discovered of prior property damage and her claims for damage to her personal property and for additional living expenses ("ALE").

With respect to the ALE claim, Ms. McKellar submitted a short-term lease agreement for a residence located at 18476 St. Marys Street in Detroit that she had executed with "Short Term Property Management," which is identified in the lease agreement as the "Landlord." *See* Defendant's Ex. E. Short Term Property Management is owned by Earl Jackson. *See* Earl Jackson Affidavit, Plaintiff's Ex. C; McKellar Affidavit, Plaintiff's Ex. D. Mr. Jackson is not named as a party in this action. The lease required monthly rental payments in the amount of $2,250.00. *See* Defendant's Ex. E. Based on the lease, State Farm initially paid Short Term Property Management three

months' ALE payments.  *See* Affidavit of State Farm Claim Specialist Kristen Braun, ¶¶ 10, Defendant's Ex. A; *see also* State Farm Claim Payment Log, Defendant's Ex. F.

After three months of ALE benefits had been paid, due to various concerns the insurer had with McKellar's claim, State Farm Special Investigative Claim Specialist Kristen Braun ran a public records search on the St. Marys property Plaintiff was purportedly leasing.  According to public records, the St. Marys property was owned by "Ish and Isha Investments." [*See* Defendant's Ex. G. ] Neither Earl Jackson nor Short Term Property Management -- Plaintiff's supposed landlord to whom the ALE payments had been paid -- was found to be associated with the St. Marys property.

Accordingly, on November 18, 2013, State Farm sent a "reservation of rights" letter to Plaintiff at the St. Marys address.  However, the letter was returned to State Farm on December 1, 2013 with a postal service "addressee unknown" sticker and the words "no longer reside" handwritten in bold on the envelope.  *See* Defendant's Ex. H.

Ms. Braun thereafter personally visited the St. Marys property on December 12, 2013.  *See* Braun Affidavit, Defendant's Ex. A.  She knocked on the door, but no one answered and there were no cars in the driveway.  *Id.* She then canvassed the neighborhood and spoke with a neighbor, Leo Presstone, who advised Braun that the person who lived in the house  in question was a man, not a woman, and that the man had asked Presstone to "keep an eye on the property for him" when he is not there. *Id.*

Based on what was learned during the investigation, State Farm suspended

4

Plaintiff's ALE benefits.  Apparently, when no ALE lease payment for January was made, Plaintiff contacted State Farm.  State Farm responded to Plaintiff's inquiry by way of a letter dated January 7, 2014 which was sent to "Letita McKellar c/o Attorney Mohamed Nasser" at Attorney Nasser's Griswold Street address.  *See* Defendant's Ex. I. In this letter, State Farm informed Plaintiff that her ALE benefits were suspended and, therefore, the lease payment which was scheduled for January 11, 2014 would not be made.  State Farm also exercised its option under the insurance policy and requested Ms. McKellar submit to an examination under oath ("EUO")[1] to answer questions about the property, her claimed damages, and her lease of the St. Marys property, among others.

---

[1]  Section I of the Policy sets forth the insured's obligations following a loss and includes the requirement that she submit to an examination under oath when requested:

> **Your Duties After Loss.**  After a loss to which this insurance may apply, you shall see that the following duties are performed:
>
> ***
> as often as we reasonably require:
>
> > . . . submit to and subscribe, while not in the presence of any other insured:
> >
> > > (a) statements; and
> > >
> > > (b) examination under oath; and
> > >
> > > (c) produce employees, members of the insured's household or others for examination under oath the extent it is within the insured's power to do so. . . .

[Policy § I(d)(3), Defendant's Ex. B, pp. 13-14]

The EUO began on February 17, 2014 but was not completed that day due to an approaching snowstorm.  Plaintiff agreed to adjourn the EUO and to continue on a later date.  It was continued and completed on April 3, 2014.

At the commencement of the EUO, Plaintiff was reminded of, and acknowledged, her obligation to provide truthful answers:

Q:      You understand you're under oath today and you have an obligation to tell the truth about these matters?

A:      Yes.

Q:      Do you understand you have an obligation not to conceal material information and not to misrepresent material information to State Farm?

A:      Yes.

Q:      And do you understand if you do either of these things, intentionally conceal or intentionally misrepresent material information, it could result in loss of benefits that you might otherwise be entitled to receive?

A:      Yes.

[Examination Under Oath of Letita McKellar, Defendant's Ex. J, p. 8.]

Plaintiff testified in response to questioning on February 17, 2014 as follows with regard to the St. Marys property:

Q:      Okay.  Where are you currently living?

A:      On St. Mary's.

Q:      And what's the actual address there?

6

A:     18476, I believe.

Q:     Is that in Detroit?

A:     Yes.

Q:     Is that a house you are renting?

A:     Yes.

Q:     And are you renting the whole house or just a room?

A:     It's a house.

Q:     And who is the landlord?

A:     His name is Earl Jackson.

Q:     And about how long have you been living on St. Mary's?

A:     Since October 2013.

                               ***

Q:     I'll hand you what we'll mark as Exhibit 1.  Is this the lease
       agreement for that property?

A:     Yes.

Q:     Okay. And so is Mr. Jackson, Short Term Property Management, is
       that his company?

A:     Yes, I believe.

*Id.*, pp. 14-15.

During her continued examination on April 3, 2014, Plaintiff testified that she had

moved out of the St. Marys property and returned to living in her own Muirland house

during the week of February 17, 2014.  State Farm sought an explanation as to why the

7

letter that had been sent to her three months earlier, on November 18, 2013, was returned to State Farm with the words "no longer reside" written on them:

> Q:     [W]as there any point where you left St. Mary's back in November, where you weren't living there?
>
> A:     It may be around the holiday time.
>
> Q:     Okay.  Where did you go for the holidays?
>
> A:     Over my brother's.
>
> Q:     How long were you at your brother's?
>
> A:     A couple weeks.

[Continued EUO, Defendant's Ex. K, pp. 156-57].

But then, when confronted with what the neighbor, Mr. Presstone, had said about no woman living at the St. Marys house, Plaintiff testified as follows:

> Q:     You were for sure living there, correct?
>
> A:     Not everyday, but I was there.
>
> Q:     How many days do you think you were there a week?
>
> A:     Possible three . . .[t]o four.

*Id.* at 159.

However, after a break in the proceedings during which Ms. McKellar was able to speak to her attorney, McKellar changed her story again:

> A:     I may have been incorrect on the day that I left because I went to my brother's house, well, I did say November, around that time.

8

Q:      Around the holiday you said.

A:      And I, basically stayed there and I went back and forth there to get clothes that we needed so it's like **I really wasn't staying there [on St. Marys], but I had my things there** so that's the only thing.

Q:      And when you say "staying *there*" you mean St Mary's?

A:      Yes.

                                    ***

Q:      Okay. And was there a reason you stopped staying at St. Mary's in November to go to your brother's?

A:      I wasn't comfortable.

Q:      Was it not safe or was the landlord doing something?  What was --

A:      I wasn't, I didn't, I wouldn't say it wasn't safe. It just, I just felt, you know, it was the house and I just, I just didn't feel, I just didn't feel comfortable with me and my daughter.

*Id.* at 167-68 (emphasis added).

After completing its investigation, State Farm formally denied liability for Plaintiff's claims based on its belief that Ms. McKellar had been involved in causing the water damage to the Muirland property, and that she violated the policy's concealment or fraud provisions by, among other things, intentionally misrepresenting material facts regarding her residency at the St. Marys property for which ALE benefits had been paid after the water damage incident.  *See* State Farm's Affirmative Defenses, Dkt. # 3.

After her claim was denied, McKellar initiated this action in Wayne County Circuit Court.  State Farm timely removed the case to this Court on diversity grounds on

9

September 26, 2014.[2]   The parties thereafter engaged in discovery.[3]

During discovery, State Farm deposed Dasumo Mitchell, the owner of Ish and Isha Investments, the entity which, according to county records, owned the St. Marys property.  Mr. Mitchell, a River Rouge police officer, testified that he and his wife owned Ish and Isha Investments, but that his wife is only listed as a co-owner in case something were to happen to him; he is the only person who deals with the St. Marys property. [Dasumo Dep., Defendant's Ex. L, pp. 5, 7, 9.]

Mitchell testified that Ish and Isha Investments rents out the property on a "short-term" basis, and he identified the various tenants to whom he rented the property from March 11, 2013 through February 28, 2014.  [*See* Mitchell Dep., Defendant's Ex. L, pp. 11-15].  None of the tenants to whom Ish and Isha rented the property during this period was Letita McKellar.[4]  Mitchell testified that the property was vacant during the months

---

[2]   In support of removal, Defendant submitted a building repair estimate and Plaintiff's personal property inventory, showing that "the amount in controversy in this action is no less than the sum of $102,704.50, exclusive of interest and costs." Though the Court has concerns about satisfaction of the jurisdictional amount, Defendant's submissions with its Notice of Removal appear to satisfy the *de minimus* requirements for removal.  *See Dart Cherokee Basin Operating Co., LLC v. Owens*, ___ U.S. ___, 135 S.Ct. 547, 190 L.Ed.2d 495 (2014) (a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold).

[3]   Originally, the Court allowed a five-month discovery period which was extended another two months on the parties' joint motion for extension of deadlines.  *See* Dkt. Nos. 7, 15, and 16.

[4]   Mitchell testified that from March 11 through June 11, 2013, he leased the property to a woman named Melba Turner, and then from February 28 through July 28, 2014, the property was leased to a man named Edward Simmons. [Dasumo Dep., pp. 11-

10

of October and November 2013; occupied by a few short-stay Airbnb tenants for brief periods from December 15 through December 17, 2013, from January 2 through January 6, 2014, and from February 20 through February 23, 2014; and was not tenant-occupied again until August 14, 2014, when the property was leased to a man named Thomas Burnside.  [Mitchell Dep., pp. 9-15].

Mr. Mitchell admitted knowing Earl Jackson, the individual who purportedly leased the St. Marys property to Plaintiff McKellar.  He testified that he met Jackson through a former acquaintance sometime in early March 2013, and knew him as the owner of "Short Stay Insurance Company."  *Id.* at 10; 19.  Mitchell said he thought Jackson was an insurance adjuster. *Id.*

According to Mitchell, on a few occasions, Jackson found him a tenant for the St. Marys property.  He testified that only three tenants had been brought to him by Jackson -- Melba Turner, Edward Simmons and Thomas Burnside.  *Id.* at 10-11.  One or more of these three tenants had come to live at the St. Marys property after an insurance claim.  *Id.* at 10.

Mitchell testified that, as with all of his tenants, whenever the property was leased

---

12].  In the period between June 11, 2013 and February 28, 2014, he testified that he rented the property out a few times for very brief periods of time through the online rental website Airbnb.com,  His records showed that December 15-17, 2013 the property was rented through Airbnb to Jorge Fis; December 21-22, 2013 it was rented to Rekymdria Vaughan; January 2-6, 2014 it was rented to Navjot Sagoo; and February 20-23, 2014 it was rented to Gina Maddox.  [Mitchell Dep., pp. 11-15.]  For these short-stay traveling tenants, Mr. Mitchell explained that the tenant paid Airbnb, and Airbnb, in turn, paid him.  *Id.* p. 15.

11

to one of the individuals Earl Jackson found, he, Mitchell, personally met the prospective tenant and showed the tenant the property, and the lease agreement was always entered into between the tenant and Ish and Isha Management, as the landlord; neither Jackson's name nor "Short Term Property Managment" (or "Short Stay Insurance Company") appears on leases for the property. *Id.* at p. 15. Mitchell signs all of the leases; Jackson did not sign any leases for tenants he found for Ish and Isha Investments, nor was he ever authorized to do so. *Id.*

Mitchell testified that, until it was shown to him at his deposition, he had never seen the short-term lease agreement Ms. McKellar submitted to State Farm in this case. *Id.* at p. 17. Though the blanks for the parties' names on the face of McKellar's purported Short Term Lease Agreement are filled-in to indicate that "[t]his lease is made this 10th day of October 2013 by and between Short Term Property Management [Landlord] [and] Letita McKellar claim # 22-338H857", the agreement is not signed by anyone on behalf of the "landlord"; the only signature that appears on the document is that of Letita McKellar.[5]

Mitchell explained that before a lease agreement was executed, the prospective

---

[5]  It appears that page 3 of this form Lease Agreement would have been the signature page for the landlord; the document submitted by Plaintiff bears pages numbered 1, 2 and 4. Page 3 is missing. Mr. Mitchell testified that Ish and Ish Investments uses the same Short-Term Lease Agreement form but he noted that on his company's form "there would be a spot for me to sign" on behalf of Ish and Isha Investments. [Mitchell Dep., p. 25.] No landlord signature space is found on Ms. McKellar's lease.

tenants Jackson found for him would come and view the property:  "I meet them at the property and I show the property off to the potential tenant." *Id.* at 24.  He added that he has an alarm installed on the house, and when someone leases or rents the property, he has to give them an alarm code to get into the house.  *Id.* at 20, 23-24.[6]  Mitchell testified that Earl Jackson did not have the alarm code and, although Jackson was present when Mitchell showed the property to the three prospective tenants Jackson had found, he is "one hundred percent confident" that Jackson could not have viewed Mitchell's entry code to get into the house himself.  *Id.* at 24.

With respect to lease payments, Mitchell said that the three tenants Jackson found paid their rent to Jackson, and Jackson, in turn, remitted the payments to Mitchell by check. *Id.* at pp. 17-18.  He received no lease payments from Jackson, however, from October 11, 2013 through January 11, 2014 (i.e., the period when Letita McKellar was supposedly leasing the property).  *Id.* at 17.  Mitchell further testified that he does not use a property management company; he manages and maintains the property himself:  he visits the property once a week, even when it is unoccupied, adding that "the neighbors keep an eye on the property, as well."  *Id.* at 20-22.

To rebut Mr. Mitchell's testimony, Plaintiff has submitted the July 1, 2015 Affidavit of Earl Jackson as an exhibit to her Response Brief. In this Affidavit, Jackson

---

[6] Mitchell explained that he has the master code allowing him to enter the house and that when a tenant signs a lease, he has the tenant pick four numbers to use as an auxiliary code to enter the house.  *Id*. at 23-24.

states:

1. That I am the owner of Short-Term Property Management.
2. That on October 10, 2013, **I entered into a lease with Letita McKellar regarding the property located at 18746 St. Mary's [sic]**, Detroit, Michigan.
3. That Short-Term Property Management has conducted leases regarding property located at 18476 St. Mary's [sic], Detroit, Michigan, in the past, and that **as exclusive manager of the property, I had exclusive or majority domain.**
4. That pursuant to the terms of the lease, Letita McKellar would reside in the property beginning on October 11, 2013, and terminate her occupancy on January 11, 2014.
5. That Ms. McKellar would be paying Short-Term Property Management rent in the amount of $2,250.00 per month.
6. That Ms. McKellar signed the lease agreement and initialed the applicable terms.

[Earl Jackson Affidavit, Plaintiff's Response Brief Ex. C. (Emphasis added).]

Plaintiff also submitted her own Affidavit. In McKellar's June 30, 2015 Affidavit,

she states, in pertinent part:

1. That I am the owner of the property located at 18254 Muirland Street in Detroit, Michigan.
2. That on or about September 2, 2013, I returned home from a vacation and found that my home had been severely damaged in a flood.
3. That I made a claim with my insurance company, State Farm Fire and Casualty Company on my policy, number 82-B6-G765-4.
4. That on October 10, 2013, **I entered into a lease with Earl Jackson, owner of Short-Term Management**, regarding my lease of the property located at 18476 St. Mary's [sic], Detroit, Michigan.
5. That **I believed Mr. Jackson, as property manager of the residence located at 18476 St. Mary's [sic], had full authority to negotiate a lease of the property.**
6. That pursuant to the terms of my lease, I resided in the property beginning on October 11, 2013.
7, That I personally stayed in the residence for limited periods during the time of my lease, and spent the remainder of that period with friends and

14

family, who helped get me back on my feet after the loss of my home.
8.  That while I was not always present within the St. Mary's [sic] property
personally, I left the limited personal property I salvaged from the flood
within the residence.

[McKellar Affidavit, Plaintiff's Ex. D. (Emphasis added).]

As indicated, in these affidavits both Jackson and McKellar characterize Jackson
as the property manager of the St. Marys property, and state that, in that capacity, he had
the authority to enter into a lease agreement.  Yet, within her Response Brief, Plaintiff
does not take the same position.  Instead, she states that Jackson *leased the property from
the owner* and characterizes the lease she executed as a *sublease* of the St. Marys
property:

"Although the landlord of the St Marys Property is reported to be Ish and Isha
Investments, Plaintiff **subleased the property from its current lessor, Mr. Earl
Jackson of Short Term Property Management**, located at 5990 Oakman Blvd.,
Detroit, Michigan."

*See* Plaintiff's Response Brief, p. 2 (emphasis added).)  There is, however, no evidence
anywhere in the record that Mr. Jackson was ever a lessor of the St. Marys property.

## II.  DISCUSSION

A.    APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule
56[] mandates the entry of summary judgment, after adequate time for discovery and
upon motion, against a party who fails to make a showing sufficient to establish the

15

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the foregoing standards in deciding Defendant's motion for summary judgment in this case.

B.     THE COURT WILL NOT CONSIDER THE AFFIDAVIT OF EARL JACKSON SUBMITTED BY PLAINTIFF AFTER DEFENDANT FILED ITS MOTION FOR SUMMARY JUDGMENT.

As an initial matter, the Court will address Defendant's request that the Court either strike or not consider the Affidavit of Earl Jackson which Plaintiff submitted along

16

with her Amended Response to Defendant's Motion for Summary Judgment.

State Farm requests that the Court strike and/or refuse to consider Mr. Jackson's affidavit because of his refusal to appear for his deposition during the discovery period where he could have been cross-examined and confronted with the evidence and testimony provided by Mr. Mitchell.

During discovery, State Farm attempted to serve Mr. Jackson with a subpoena to appear for deposition but Mr. Jackson evaded service. [*See* Motion for Alternate Service, Dkt. No. 10] After the process server made eight unsuccessful attempts to personally serve Jackson, the Court ordered alternate service and Jackson was served with the deposition subpoena by mail. [*See* 1/15/15 Order Granting Motion for Alternate Service, Dkt. No. 12.] The subpoena was also served by posting on the door of his residence. *Id.* The subpoena directed Jackson to appear for his deposition on February 19, 2015. *See* Dkt. Nos. 13; 26-2. However, Mr. Jackson failed to appear.

State Farm argues that Plaintiff's use of Mr. Jackson's affidavit amounts to "an ambush," because State Farm was precluded from obtaining information during discovery and only learned of Jackson's affidavit after discovery had closed and after its dispositive motion had been filed. In support, State Farm relies upon *Bumpas v. Ryan*, No. 07-cv-0766, 2013 WL 2418258 (M.D. Tenn. June 3 2013). The circumstances in *Bumpas* are similar to those in this case.

In *Bumpas*, after the defendant filed a motion for summary judgment, the plaintiff

17

responded and attempted to create an issue of fact by submitting in support of his

response a non-party witness's affidavit.  The court struck the non-party witness's

affidavit, holding

> It is unreasonable to rely on affidavit "evidence" from an individual who has made
> himself unavailable for discovery and for whom there is even no indication he will
> be available for trial.

*Id.*, 2013 WL 2418258 at *2 (quoting *Dedvukaj, Inc. v. Equilon Enter., LLC*, 301 F.

Supp. 2d 664, 668 (E.D. Mich. 2004)).

The Court likewise finds that it would be unreasonable to rely on Earl Jackson's

affidavit in this case.  Mr. Jackson deliberately made himself unavailable for his

discovery deposition.  Jackson knew State Farm wanted to depose him:  He spoke on the

phone with the process server who had left his business card at Jackson's business

address after his first attempt to serve Jackson with a deposition subpoena.  *See* Affidavit

of Jeff Kaplan on Attempted Service on the Witness Earl Jackson, Dkt. # 11-3.  The

process server told Jackson he wanted to serve him with a deposition subpoena, and

Jackson gave the process server a date, time and location where he could be served, but

Jackson failed to appear.  *Id.*  Thereafter, Jackson evaded service on eight separate

occasions, *see id.*, which resulted in the court-ordered alternate service of the subpoena

by mail and posting.  Yet, Jackson ignored the court order and still did not appear for his

deposition.  Under these circumstances he cannot now give unchallenged affidavit

testimony.  To hold otherwise would clearly violate the purpose of discovery.

Moreover, while affidavit testimony generally may be considered at the summary judgment stage when the affiant could later present the evidence through direct testimony at trial, *see DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911-13 (E.D. Mich. 2008) (collecting cases), as Jackson was never listed on Plaintiff's witness list, Plaintiff would be precluded from presenting him as a witness at trial. *See* Scheduling Order, ¶ 2 ("No witness, expert or non-expert, may be called for trial unless the witness's name is listed by the respective dates set forth herein without order of the Court upon showing that the witness sought could not be reasonably have been listed as of this date." *Id*.).[7]

For the foregoing reasons, the Court will not consider Earl Jackson's affidavit in deciding Defendant's motion for summary judgment.

C.     <u>MICHIGAN LAW APPLIES IN THIS MATTER</u>

As this is an action brought before this federal court on the basis of diversity of citizenship, the Court is required to apply the same law as if the action had been brought in a state court where the federal court is located. *Stalbosky v. Beleu*, 205 F.3d 890, 893 (6th Cir. 2000). This case, accordingly, will be governed by Michigan law.

D.     UNDER THE INSURANCE POLICY, CONCEALMENT OR FRAUD PRECLUDES RECOVERY OF BENEFITS

---

[7] Pursuant to the February 20, 2015 Order granting the parties' joint motion to modify the scheduling order dates, the scheduling order deadlines were modified: the revised deadline for listing expert witnesses was May 15, 2015 and the deadline for listing non-expert witnesses was June 15, 2015. *See* Dkt. # 16. Plaintiff filed her witness list on June 15, 2015 but Earl Jackson was not listed therein. *See* Dkt. # 22.

The State Farm Homeowner's Policy in this case provides, in relevant part:

SECTION 1 -- COVERAGES
***
COVERAGE C -- LOSS OF USE

1.    **Additional Living Expense.**  When a Loss Insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months.  Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months.  this coverage is not reduced by the expiration of the policy.

[[*See* State Farm Homeowner's Insurance Policy, Defendant's Ex. B, pp. 3, 5.]

The Policy also contains a fraud provision:

.    **Concealment or Fraud.**  This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

*Id.* p. 20.]

Michigan courts have consistently ruled that the type of fraud provision contained in the State Farm Policy will nullify an insured's right to recovery based upon willful and material misrepresentations and concealments which are made with the intent to defraud the insurer.  *See West v. Farm Bureau Mut. Ins. Co.*, 402 Mich. 67, 259 N.W.2d 556 (1977); *Campbell v. Great Lakes Ins.Co.,* 228 Mich. 636, 200 N.W. 457 (1924); *Tiefenthal v. Citizens Mut. Fire Ins. Co.*, 53 Mich. 306, 19 N.W. 9 (1884).

20

The Sixth Circuit, applying Michigan law, succinctly delineated the elements of an insurer's fraud defense:

> To void a policy because the insured has wilfully misrepresented a material fact, it must be shown that (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time he made the representation or that it was made recklessly, without any knowledge as to its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it.

*Sinkfield v. State Farm Ins.,* 580 F. App'x 323, 326 (6th Cir. 2014) (quoting *Rayis v. Shelby Mut. Ins. Co. of Shelby, Ohio*, 80 Mich. App. 387, 264 N.W.2d 5, 8 (1978) (internal quotation marks omitted)).  The insurer must prove these elements by a preponderance of the evidence.  *See Stein v. Home-Owners Ins. Co.*, 303 Mich. App. 382, 843 N.W. 2d 780, 784 (2013).

Furthermore, under Michigan law, it matters not that the fraud be perpetrated in connection with only a portion of the loss claimed by an insured.  *See Martin v. Farm Bureau General Ins. Co. of Michigan*, 2008 WL 1807940 (Mich. App. Apr. 22, 2008) ("To void the policy, the insured is not required to lie about all of his or her losses; rather a lie related to a single loss operates to void the policy." *Id.* at \*3 (citing *Robinson v. City of Detroit*, 462 Mich. 439, 461-462, 613 N.W.2d 307 (2000)); *see also Flowers v. IDS Property Casualty Ins. Co.,* 2012 WL 5906728 (E.D. Mich. Nov. 26, 2012).

The *Flowers* case is analogous to this action.  In *Flowers,* the plaintiff filed a homeowner's insurance claim for ALE benefits, representing that she entered into a short-term lease agreement for property which the insurer later discovered she actually

21

owned.  Before discovering the fact that the insured owned the ALE property, the insurer

had issued ALE payments to her totaling $6,000.00.  The court found that the insured's

concealments and/or misrepresentations regarding her ownership of the ALE property

were sufficient to void the entire policy as a matter of law:

> It is ... not genuinely in dispute that this fact [that Plaintiff owned the
> property] would have been material to IDS in its evaluation of Plaintiff's request
> for $3,000 in alternate monthly living expenses. To be considered material, a
> statement need not relate[ ] to a matter or subject which ultimately proves to be
> decisive or significant in the ultimate disposition of the claim; rather, it is
> sufficient if the statement was reasonably relevant to the insurance company's
> investigation of a claim.  It is beyond reasonable dispute that had IDS been
> informed of Plaintiff's ownership of the 9283 Steel Property for which she sought
> reimbursement of $3,000 per month in alternate living expenses, this would have
> been "reasonably relevant" to their review of her claim for alternate living
> expenses.

> Nor is it significant that the concealed and misrepresented facts related only
> to that portion of the claimed loss relating to alternate living expenses. In *Martin v.
> Farm Bureau General Ins. Co. of Michigan*, No. 275261, 2008 WL 1807940
> (Mich. Ct. App. April 22, 2008) (unpublished opinion) the Michigan Court of
> Appeals addressed this very issue. In *Martin*, the defendant insurance company
> denied its insured's claim for loss related to a fire on the basis of arson, fraud and
> false swearing. Id. at *1. The jury found that the insured did not commit arson but
> did make false statements regarding the amount of his personal losses. *Id*. The trial
> court found that the jury's verdict was against the great weight of the evidence
> because the insured's misrepresentations pertained only to his personal losses and
> it was "a harsh result" to deny the insured coverage for his real property and
> emergency housing expenses. *Id*. Reversing the trial court and remanding for entry
> of judgment for the defendant, the court of appeals reasoned:

> > Here, the insurance policy clearly states that the entire policy is void
> > if the insured conceals or misrepresents material facts or
> > circumstances, engages in fraudulent conduct or makes false
> > statements relating to either the insurance or to a loss to which the
> > insurance applies. The policy condition does not differentiate
> > between coverages for personal property, realty, and emergency

living expenses, and specifically voids the whole policy upon a finding of misrepresentation or fraud. Furthermore, **the misrepresentation or fraud must only pertain to a loss, in order to nullify coverage. Thus, to void the policy, the insured is not required to lie about all of his or her losses; rather a lie related to a single loss operates to void the policy.... [P]laintiff argues that his insurance policy should not be voided for misrepresentations about items that represented a small percentage of his claim. Unfortunately for plaintiff, the insurance policy does not differentiate between big and small lies. The policy clearly states that the entire policy is void if the insured conceals or misrepresents material facts or circumstances, engages in fraudulent conduct or makes false statements relating to either the insurance or to a loss to which the insurance applies. The jury found that plaintiff committed fraud and false swearing regarding the claims he submitted to defendant. An insurance policy must be enforced in accordance with its terms.**

*Flowers*, 2008 WL 1807940 at *6 (some citations and internal punctuation omitted; emphasis added).

The foregoing makes clear that there is no merit in Plaintiff's argument that, if she made any fraudulent misrepresentations, at most, they should preclude only her recovery of $9,000.00 in ALE benefits. A finding of fraud or concealment concerning her claim for ALE benefits will void the whole policy and bar Plaintiff's recovery of any benefits.

Although the Court finds in favor of Defendant State Farm with regard to its argument that ALE fraud would bar Plaintiff's recovery of any benefits under the policy, the Court, nonetheless, finds that a grant of summary judgment in favor of the insurer here would be inappropriate as the Court finds there is an issue of fact as to whether Ms. McKellar knew that the lease she entered into with Earl Jackson's company was

23

fraudulent such that it can be inferred that she submitted the lease to State Farm with the intent to defraud the insurer. Intent to defraud is ordinarily a question of fact for the jury to decide. *West v. Farm Bureau Mut. Ins. Co. of Mich*., 402 Mich. 67, 259 N.W.2d 556, 557 (Mich.1977). *See also Zayour v. Liberty Mutual Ins. Co.* WL 3611766 (E.D. Mich. July 22, 2014).

Defendant argues that the Court can rule based on the fraud or concealment clause as a matter of law and, in support, relies on the Sixth Circuit's decision in *Sinkfield v. State Farm Insurance*, 580 F. App'x 323 (6th Cir. 2014). The Court finds *Sinkfield* distinguishable.

In *Sinkfield*, the plaintiff filed for Chapter 7 bankruptcy in 2010 claiming personal property assets totaling only $4,000 and liabilities over $82,000. She also stated the value of her home at the time was $27,000. She was discharged from bankruptcy in April 2011. Less than 14 months later, in June 2012, Sinkfield's home caught fire. She filed a claim under her homeowner's policy claiming that the fire caused $143,000 worth of damage to the house and destroyed $170,000 worth of personal property. Arguing that Sinkfield misrepresented the amounts of her losses, State Farm moved for summary judgment based upon a "Concealment or Fraud" clause identical to the one in this case.

The Sixth Circuit determined that the court could rule based on the fraud defense as a matter of law under the particular circumstances presented in the case. The appellate court explained:

As a general matter, whether misrepresentations or false statements void an insurance policy depends upon the intent to defraud and this is a question of fact for the jury. When the alleged misrepresentation comes down to a disparity between the true value of the damaged property and the value claimed by the insured, Michigan courts will submit these cases to a jury so long as the claimant has a plausible non-fraudulent explanation for the disparity -- even if the disparity is rather large. However, we can rule on this defense as a matter of law if the difference between the actual value of the property and the claimed value of the property is "extreme."

580 F. App'x at 326-27 (citations and some internal punctuation omitted).

The instant case does not present an issue of disparity of value. Rather, the case specifically will turn on whether McKellar intended to defraud State Farm by submitting a lease she ostensibly entered into with Earl Jackson, who undisputedly was not the owner of the St. Marys property.[8]  Under these circumstances, the Court concludes that the case presents issues of credibility and questions of fact for the jury to decide.

---

[8] The Michigan Supreme Court has held that only the fraud of the insured party would void the policy. *See Morgan v. Cincinnati Ins, Co.*, 411 Mich. 267 (1981). Hence, the fraud of individuals not party to the insurance contract will not bar an innocent insured's claim.

25

<u>CONCLUSION</u>

For all of the foregoing reasons reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

**[Dkt. # 18]** is DENIED.

The case will proceed to Final Pretrial Conference and Trial.


<u>s/Gerald E. Rosen</u>
United States District Judge

Dated:  January 26, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 26, 2016, by electronic and/or ordinary mail.

<u>s/Julie Owens</u>
Case Manager, (313) 234-5135

26